UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA ANDERSON, individually and on
behalf of others similarly situated,

        Plaintiff,

v.

THE MINACS GROUP (USA) INC.,

        Defendant.

_____/

Case No. 16-13942

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFF'S PRE-DISCOVERY
MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION [11]**

On November 7, 2016, Plaintiff Brenda Anderson commenced this action on behalf of herself and other similarly situated current and former employees of Defendant, The Minacs Group (USA) Inc., alleging that Defendant violated the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* by failing to compensate Plaintiff and other call center representatives for all work activities they performed and failing to pay overtime for work in excess of 40 hours per week. Plaintiff further alleges that Defendant unlawfully retaliated against her by terminating her employment after she complained that she had not received overtime pay to which she was entitled under the FLSA.

Through the present motion filed on December 30, 2016, Plaintiff requests that the Court (i) conditionally certify a collective action under the FLSA, and (ii) approve a proposed notice to be issued to the members of this putative class, consisting of all current and former hourly customer service representatives who worked at Defendant's Farmington Hills, Michigan call center during the past three years. Plaintiff further asks that Defendant

be compelled to identify all potential members of this putative class and provide their contact information, and that the putative class members be granted a period of sixty days to submit notices stating that they wish to join this class.

On April 26, 2017, the Court heard oral argument on Plaintiff's motion. For the reasons stated more fully below, the Court GRANTS this motion, except to the extent that Plaintiff seeks authorization to distribute notice to the putative class via text message.

## I.  FACTS

### A.  The Parties

The Defendant company, The Minacs Group (USA) Inc., is a business and technology support service provider for clients in a wide range of industries, including manufacturing, retail, banking, health care, and the public sector. Defendant's headquarters is located in Farmington Hills, Michigan.[1]

At all relevant times, Defendant's Farmington Hills office has been the site of a call center, in which hourly customer service representatives ("Representatives") handle telephone calls from customers of Defendant's clients. Representatives report to Team Leaders, each of whom manages multiple Representatives, and Team Leaders, in turn, report to the Team Manager. Each of Defendant's call centers has multiple "campaigns," or client-specific programs, and each of the company's Representatives works for a specific campaign and receives training that is tailored to a particular client's computer systems and customer needs.

---

[1]The Minacs Group evidently was acquired by SYNNEX Corporation in August of 2016, and has been integrated into SYNNEX's Concentrix business segment. Nonetheless, the parties continue to refer to The Minacs Group as the defendant in this case, and the Court will do likewise in this opinion.

The named Plaintiff, Brenda Anderson, was employed as a Representative in Defendant's Farmington Hills call center from approximately September 2011 to October 2015. According to Defendant, Plaintiff worked on the Consumers Energy campaign, one of multiple campaigns operating out of Defendant's Farmington Hills office. At the time of her discharge, Plaintiff's pay rate was $11.25 per hour. Since this suit was brought, three additional individuals who worked as Representatives in Defendant's Farmington Hills office — Alicia Currie, Terra Page, and Marcus Van — have given their written consent to join this suit as plaintiffs.[2]

### B. Plaintiff's Supporting Declarations

In support of the present motion, Plaintiff has submitted declarations from herself and another former Representative, Alicia Currie. Plaintiff states in her declaration that as a Representative employed at Defendant's Farmington Hills call center, her "primary duty was answering telephone calls regarding billing and other account activity from customers of [Defendant's] clients." (Plaintiff's Motion, Ex. 3, Anderson Decl. at ¶ 5.) In handling these calls, Plaintiff "performed work on a computer supplied by [Defendant], including reviewing customer accounts, preparing forms for customers, transcribing notes from calls for other representatives, and reading and sending work emails." (*Id.*)

At the beginning of each shift, Plaintiff had to perform a number of tasks before she could begin to accept incoming customer calls. First, she had to "enter[] a security code to enter [her] assigned office concourse" and "walk[] to [her] cubicle[]." (*Id.* at ¶ 10.)

_____

[2]In its response to Plaintiff's motion, Defendant asserts (without citation to the record) that Mr. Van worked at a different call center and was assigned to a different campaign than Ms. Anderson, Ms. Currie, and Ms. Page.

Plaintiff then "logg[ed] into [her] work computer[] and Windows operating system[]," and began "loading applications (including one called 'Citrix') which enabled [her] to review customer accounts, prepare forms for customers, and transcribe notes form calls for other representatives." (*Id.*) Once these applications "were fully open and loaded, [Plaintiff] accessed [Defendant's] telephone system 'IEX,' which enabled [her] to start receiving inbound calls." (*Id.*)

Plaintiff estimates that "due to delays in [Defendant's] computer systems, it took anywhere from 3-10 minutes on most days for the required computer applications to open and load." (*Id.*) To ensure that this process was completed prior to the beginning of her scheduled shift, Plaintiff was instructed by the individual who trained her, Ken Ford, and her manager, Margarita Vasquez, that she should arrive fifteen minutes before her scheduled shift. (*Id.* at ¶¶ 11-12.) In light of these directives, Plaintiff "frequently arrived at the office concourse and began logging into [her] computer[] and opening applications approximately fifteen (15) minutes before the start of [her] scheduled shift[]," and she observed other Representatives doing likewise. (*Id.* at ¶ 14.) If she was able to complete this process before the start of her scheduled shift, Plaintiff would "spend the remaining time reviewing work e-mails that contained information necessary for [her] to perform [her] duties" as a Representative. (*Id.*)

Plaintiff states that she and her fellow Representatives were not paid for the time spent on these preparatory tasks. (*Id.* at ¶ 15.) Although Defendant "maintained a formal policy — applicable to all representatives — of allowing representatives to submit requests to be paid for time spent waiting for computer applications to load," Plaintiff states that the actual company practice was "not [to] pay for pre-shift time, even if a representative

4

requested to be paid for it." (*Id.*) Plaintiff further asserts that "[o]n many occasions [she] followed [Defendant's] protocol for requesting to be paid for pre-shift time," but that each such request was "ignored." (*Id.*)

Plaintiff next states that Defendant "frequently denied [her] . . . hourly compensation for time during [her] shift[] in which [she] was not engaged in telephone calls with customers," but instead was performing such tasks as "reviewing customer accounts, preparing forms for customers, transcribing notes from calls for other representatives, reading and sending work emails, [and] troubleshooting connectivity issues with [Defendant's] computer and telephone systems." (*Id.* at ¶ 17.) Plaintiff also asserts that Defendant's timekeeping system experienced "persistent irregularities" that would result in employees "randomly" being designated as "no call" or "no show" and being denied pay for their work. (*Id.*)

Plaintiff states that she "frequently worked over forty (40) hours per week," including Monday through Friday and "additional shifts on Saturdays." (*Id.* at ¶ 4.) Nonetheless, on one occasion in September of 2015, Plaintiff received a paycheck that reflected "significantly fewer overtime hours than [she] had worked." (*Id.* at ¶ 18.) When Plaintiff looked into this issue, she was advised by her Team Leader, Tiara Milton, that her clocked hours had been "reduced . . . to reflect only the time [she] spent engaged in telephone calls with customers." (*Id.*) Milton further advised Plaintiff that "she was required to alter [Plaintiff's] time in this manner due to [Defendant's] corporate policy," which entailed Team Leaders "manually reduc[ing] representatives' clocked hours to reflect only the time they spent on the telephone with customers." (*Id.* at ¶¶ 18-19.) Defendant's Team Leaders purportedly "determined which time to remove from representatives' clocked hours based

on measurements of their call times performed by IEX, the telephone application used by all representatives at [Defendant's] Farmington Hills, Michigan call center." (*Id.* at ¶ 19.)

Following this incident in September of 2015, Plaintiff and other Representatives submitted a grievance challenging Defendant's policy of reducing clocked hours to reflect only the time spent on phone calls with customers. (*Id.* at ¶ 20.) In response, Defendant's human resources office advised Plaintiff and her fellow Representatives that the company "would not pay us any additional compensation on account of the hours we claimed were improperly reduced from our clocked hours." (*Id.*) Plaintiff believes that her "participation in this grievance led to [her] termination . . . several weeks later." (*Id.* at ¶ 21.)

Plaintiff states that "[a]t all relevant times, there were approximately 300-400 other hourly-paid representatives employed by [Defendant] at its Farmington Hills, Michigan call center," and that she "worked in the same office concourse" as approximately 50 to 150 of these Representatives. (*Id.* at ¶ 6.) All of the Representatives who worked at the Farmington Hills call center "had the primary duty of answering telephone calls regarding billing and other account activity from customers of [Defendant's] clients," and Plaintiff believes, based on her discussions with and observations of her fellow Representatives as they performed their jobs, that she and these co-workers were subject to common policies and procedures regarding (i) compensation only for time spent on phone calls with customers, and (ii) refusal to pay for pre-shift duties such as logging into computer systems and waiting for applications to load. (*Id.* at ¶¶ 7, 9, 13-16, 19.)

As noted, Plaintiff's motion also is supported by the declaration of a second individual, Alicia Currie, who "was employed by [Defendant] as a call center representative from approximately June 2012 to November 2015." (Plaintiff's Motion, Ex. 4, Currie Decl. at ¶

2.) Ms. Currie states that she, like Plaintiff, worked at Defendant's Farmington Hills facility, and that she was paid $10.50 per hour at the time she left Defendant's employ. (*Id.* at ¶¶ 2-3.)

The statements in Ms. Currie's declaration largely reiterate the facts attested to by Plaintiff. Ms. Currie's primary duty was answering telephone calls, and she states that she was subject to Defendant's "common policy of only paying its representatives for the time they spent engaging in telephone calls" with customers of Defendant's clients. (*Id.* at ¶¶ 7-9.) As a result, Ms. Currie asserts that she was not compensated for the time spent (i) at the beginning of her shift logging into Defendant's computer systems and waiting for the required computer applications to open and load, and (ii) on such tasks as "reviewing customer accounts, preparing forms for customers, transcribing notes from calls for other representatives, reading and sending work emails, [and] troubleshooting connectivity issues with [Defendant's] computer and telephone systems." (*Id.* at ¶¶ 10-11, 15, 17.) Ms. Currie, like Plaintiff, states that "on many occasions, [she] followed [Defendant's] protocol for requesting to be paid for pre-shift time, but [her] requests were ignored." (*Id.* at ¶ 15.)

Ms. Currie also challenged Defendant's policy of only paying its Representatives for time spent engaged in telephone calls with customers, as well as the practice of Team Leaders "to manually reduce representatives' clocked hours to reflect only" this time spent on the phone with customers. (*Id.* at ¶¶ 19-21.) In response, Ms. Currie was advised by one of Defendant's Team Managers, Stanetta Jones, "that in order to control the labor budget and motivate representatives to complete more calls, [Defendant] maintained a policy of only paying representatives for time spent engaged in telephone calls with customers." (*Id.* at ¶ 21.) Ms. Currie joined Plaintiff and other Representatives in filing a

grievance against this policy, but Defendant's human resources office advised Ms. Currie and the other grievants that no additional compensation would be paid to them "on account of the hours [they] claimed were improperly reduced from [their] clocked hours." (*Id.* at ¶ 22.)

### C. Defendant's Declaration in Opposition to Plaintiff's Motion

Defendant's response in opposition to Plaintiff's motion is accompanied by the declaration of Stanetta Jones, who currently works as an Operations Manager with supervisory responsibility over multiple campaigns conducted out of Defendant's Farmington Hills office. (Defendant's Response, Ex. 1, Jones Decl. at ¶ 1.) Ms. Jones was hired as a Team Leader in 2014, was then promoted in July of 2015 to Team Manager for the Consumers Energy campaign, and more recently was promoted to her current position of Operations Manager in July of 2016. (*Id.*) During the time Ms. Jones served as a Team Manager, Plaintiff and Ms. Currie — as well as another individual, Terra Page, who has given her written consent to join this suit as a plaintiff — were employed as call center representatives for the Consumers Energy campaign.

According to Ms. Jones, while "[t]he primary duty of a Representative is to answer customer telephone calls," these employees carry out other, related tasks such as "entering account notes and filling out necessary forms," and the time spent on all such work tasks and work related activities "is tracked and compensated." (*Id.* at ¶ 7.) In particular, Ms. Jones states that once a Representative is logged into the Web Powered Access ("WPA") application at the beginning of her shift, this employee is "on the clock" and will be paid for her time on the job until she logs out of the WPA system for a break or lunch period or at the end of her shift. (*Id.* at ¶¶ 9-11.) For Representatives who work on the Consumers

8

Energy campaign, Team Leaders are responsible for manually entering the WPA timestamp information into the IEX timekeeping system at the end of each shift, but Representatives "receive an electronic alert if the IEX data entered by the Team Leader differs from the WPA timestamp data," and this allows Representatives the opportunity to "challenge any data entry issues" concerning the time for which they will be compensated. (*Id.* at ¶¶ 12-13.)[3] In addition, Team Leaders have the ability to enter "various pay codes" into the IEX system so that Representatives may be "compensated for time they are not logged into WPA," including such circumstances as "coaching sessions" and "troubleshoot[ing] system downtime." (*Id.* at ¶ 14.)

Ms. Jones asserts that the total amount of time it takes to "get[] from the production floor door" to a workstation and then to log into the WPA system is "from 1 minute 15 seconds to 1 minute 50 seconds." (*Id.* at ¶ 9.) She further states that "[i]f the process takes longer due to computer or systems problems[,] the Representatives are trained to inform their Team Leader, who adjusts their time and therefore their pay to reflect the additional time spent logging in." (*Id.*)

## II. ANALYSIS

### A. The Law Governing Plaintiff's Motion

Through the present motion, Plaintiff requests that the Court conditionally certify this suit as a collective action under the FLSA. The pertinent FLSA provision states as follows:

---

[3]Ms. Jones states that this manual data entry process is "specific to" the Consumers Energy campaign and "is not necessarily the process" used with other campaigns. (*Id.* at ¶ 12.)

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). As the Sixth Circuit has observed, the type of suit authorized under this provision is termed a "collective action," and an individual must "opt into" the suit in order to be joined as a party plaintiff. *Comer v. Wal-Mart Stores, Inc.,* 454 F.3d 544, 546 (6th Cir. 2006). The opt-in nature of an FLSA collective action is thus "distinguished from the opt-out approach utilized in class actions under Fed. R. Civ. P. 23." *Comer,* 454 F.3d at 546.

This Court has previously elucidated the standards that govern the decision whether to conditionally certify a suit as an FLSA collective action:

> Section 206(b) establishes two requirements for a representative action brought by employees in their own behalf and for similarly situated persons. First, the plaintiffs must actually be similarly situated, and second, all plaintiffs must signal in writing their affirmative consent to participate in the action. Accordingly, the district court's task is to first consider whether plaintiffs have shown that the employees to be notified of the collective action are, in fact, similarly situated. If the plaintiffs meet this burden, then the district court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit.

> Although the phrase "similarly situated" is undefined, the Sixth Circuit has recognized that district courts typically follow a two-stage certification process to determine whether the opt-in plaintiffs and lead plaintiffs are similarly situated. The first stage of § 216(b) certification, also known as the "notice stage," takes place early in the litigation; i.e., at the beginning of discovery. It is here where the court determines whether the suit should be conditionally certified as a collective action so that potential opt-in plaintiffs can be notified of the suit's existence and of their right to participate. The second stage occurs much later; after all of the opt-in forms have been received and discovery has been concluded.

*Fisher v. Michigan Bell Telephone Co.,* 665 F. Supp.2d 819, 824-25 (E.D. Mich. 2009)

(internal quotation marks, citations, and alterations omitted).

The present motion has been brought in the "notice" stage of this litigation, before the parties have commenced any discovery efforts, and it seeks only conditional certification of this suit as a collective action. In this stage, Plaintiff "bear[s] the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiff[]." *Fisher,* 665 F. Supp.2d at 825 (internal quotation marks and citation omitted). This standard is "less stringent" than the showing demanded of a plaintiff who seeks class certification under Fed. R. Civ. P. 23, and Plaintiff may meet this burden by establishing that her claim and the claims of the opt-in plaintiffs are "unified by common theories of [Defendant's] statutory violations, even if the proofs of those theories are inevitably individualized and distinct." 665 F. Supp.2d at 825 (internal quotation marks and citations omitted).

Moreover, Plaintiff "must show only that h[er] position is similar, not identical, to the positions held by the putative class members." 665 F. Supp.2d at 825 (internal quotation marks, alteration, and citation omitted). This is a "fairly lenient" standard, entailing a "modest factual showing" that Plaintiff and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." 665 F. Supp.2d at 825 (internal quotation marks and citations omitted). In analyzing the evidence put forward by the parties, the Court "does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." 665 F. Supp.2d at 825 (internal quotation marks and citation omitted).

## B. Plaintiff Has Satisfied the Lenient Standard Governing Her Request for Conditional Certification.

Against this legal backdrop, the Court turns to Plaintiff's motion, which seeks

conditional certification of a class of "[a]ll current and former hourly customer service representatives who worked for Defendant in its Farmington Hills, Michigan call center at any time during the last three years." (Plaintiff's Motion, Br. in Support at 1.) In support of this request, Plaintiff argues that the record at this preliminary stage of this litigation sufficiently demonstrates that Plaintiff and her fellow Representatives at the Farmington Hills call center were subjected to similar policies and procedures regarding their compensation that (i) improperly disregarded some of their work-related activities in tallying the number of hours they worked, and (ii) thereby resulted in denial of overtime pay to which these employees were entitled under the FLSA. As discussed below, the Court agrees.

First, the declarations of Plaintiff and another former Representative at Defendant's Farmington Hills facility, Alicia Currie, support the conclusion that Defendant operated under policies and practices that failed to count the time spent on certain work-related activities toward a Representative's total hours worked. According to Plaintiff and Ms. Currie, Representatives were compensated only for time spent on the telephone with customers of Defendant's clients. This policy, in Plaintiff's view, unduly discounted two types of work activities that should be included in a Representative's compensated hours spent at work. First, Plaintiff states that once she arrived at her workstation at the beginning of her shift, "it took anywhere from 3-10 minutes on most days" to open and load the computer applications needed for her to receive phone calls from customers. (Anderson Decl. at ¶ 10.) Although Defendant ostensibly "maintained a formal policy . . . of allowing representatives to submit requests to be paid for time spent waiting for computer applications to load," Plaintiff asserts that Defendant did not abide by this policy,

and that her requests "to be paid for pre-shift time[] . . . were ignored."  (*Id.* at ¶ 15.)[4]

Next, Plaintiff and Ms. Currie have identified a number of seemingly necessary work activities for which they were not compensated, due to Defendant's purported practice of paying its Representatives only for time spent on the phone with customers.  Specifically, Plaintiff cites the time she spent "reviewing customer accounts, preparing forms for customers, transcribing notes from calls for other representatives, reading and sending work emails, [and] troubleshooting connectivity issues with [Defendant's] computer and telephone systems" as excluded from Defendant's calculation of her pay.  (Anderson Decl. at ¶ 17.)  When Plaintiff inquired about this, her Team Leader, Tiara Milton, told her that "she had reduced [Plaintiff's] clocked hours to reflect only the time [she] spent engaged in telephone calls with customers," and Milton further explained that "she was required to alter [Plaintiff's] time in this manner due to [Defendant's] corporate policy."  (*Id.* at ¶ 18.)[5]

This record suffices to make the requisite "modest factual showing" that Plaintiff and other potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law."  *Fisher,* 665 F. Supp.2d at 825 (internal quotation marks and citations omitted).  As this Court observed in *Fisher* — a suit which, like this one, was brought by call center employees — a number of district courts have "granted conditional certification to

---

[4]Ms. Currie's declaration includes essentially the same assertions regarding Defendant's failure to compensate her for the time spent waiting for computer applications to load and its failure to act upon her requests that she be paid for this pre-shift time.  (*See* Currie Decl. at ¶¶ 10, 15.)

[5]Again, Ms. Currie also states that she was not paid for time spent on various work tasks other than speaking on the phone with customers, and that she was told by her supervisors that this practice was attributable to Defendant's corporate policy.  (*See* Currie Decl. at ¶¶ 17, 19-21.)

call center employees alleging similar 'off-the-clock' FLSA violations." 665 F. Supp.2d at 826 (citing cases). Likewise, Plaintiff has identified still more cases "around the nation" in which district courts have conditionally certified collective actions brought by call center employees. (Plaintiff's Motion, Br. in Support at 18 (collecting cases).) And in *Fisher* itself, of course, this Court found that conditional certification was warranted based on evidence that the defendant did not compensate the plaintiff call center employees for (i) pre-shift time spent logging into their computers and loading software applications, (ii) work-related tasks other than taking calls from customers that were dictated by the defendant's expectations and quotas for employee performance, and (iii) time spent on calls that were still ongoing at the end of an employee's shift. *See Fisher,* 665 F. Supp.2d at 823, 826. Plaintiff here has produced two of these three categories of evidence, and the Court finds that this evidence is sufficient to satisfy the fairly lenient standard that governs pre-discovery conditional certification of a collective action.

Defendant suggests three grounds for avoiding this result, but none is persuasive. First, Defendant contends that the allegations and evidence produced by Plaintiff are insufficient to satisfy even Plaintiff's modest burden to show that she and the proposed class of Representatives employed at Defendant's Farmington Hills call center are similarly situated. Rather, Defendant asserts that the Representatives in this putative class differ from one another in two respects: (i) they are trained to use different computer operating systems and applications that are specific to the campaigns to which they are assigned, and thus "cannot simply be transferred from campaign to campaign without extensive training," and (ii) they are paid in accordance with systems and processes that "vary by campaign." (Defendant's Response Br. at 8-9.)

14

This challenge to Plaintiff's showing of similarly situated call center employees suffers from two deficiencies. First, even accepting that the Representatives at Defendant's Farmington Hills call center undergo training specific to their campaigns and cannot readily be reassigned from one campaign to another, any such differences among Representatives with respect to their training, knowledge, or skills have no bearing on the pertinent question here — namely, whether these employees were subject to common policies or practices concerning their compensation, such that they all were victims of the same alleged FLSA violations arising from these common policies or practices. As for Defendant's claim of compensation processes or practices that differ from one campaign to another, the record fails to disclose any meaningful differences that would undercut Plaintiff's evidence of a more uniform compensation scheme. Instead, Defendant has produced only the statement of an Operations Manager, Stanetta Jones, that the process used to pay Representatives who work in the Consumers Energy campaign is "specific to this campaign and is **not necessarily** the process for other campaigns." (Jones Decl. at ¶ 12 (emphasis added).) Ms. Jones does not elaborate on this assertion,[6] and nothing in her declaration, or elsewhere in the record, identifies particular features of the compensation schemes used in different campaigns that would undercut Plaintiff's evidence of common policies and practices that affect the pay of all Representatives employed at Defendant's Farmington Hills call center.

---

[6]Thus, while Defendant contends in its response brief that Team Leaders in the Consumers Energy campaign "manually enter WPA data into IEX" but the systems used in other campaigns "automatically upload time stamp data into IEX," (Defendant's Response Br. at 9), Defendant does not cite anything in the present record that would support this assertion.

Defendant next insists, however, that the evidence produced by Plaintiff fails to establish that any alleged shortfalls in the compensation paid to Plaintiff and other Representatives at the Farmington Hills facility are attributable to Defendant's common policies and payroll processes, as opposed to the practices of individual supervisors and employees. Defendant claims, for example, that it has "standard FLSA compliant policies" in place for its Consumers Energy campaign that required Plaintiff "to report uncompensated time to [her] Team Leader" in order to trigger payment for this time, but it states that there is "no evidence" that Plaintiff availed herself of this process. (Defendant's Response Br. at 9.) Defendant further notes that Plaintiff and the other individuals who have given their written consent to join this suit "reported to . . . different Team Leaders," which suggests the possibility that one or more of these Team Leaders might have deviated from Defendant's written policy in reducing the work hours of the Representatives they supervised. (*Id.* at 10.) These individualized inquiries, in Defendant's view, defeat Plaintiff's showing that she and the other Representatives at Defendant's Farmington Hills call center are similarly situated.

These challenges once again run afoul of the limited record presently before the Court. Contrary to Defendant's contention, both Plaintiff and Ms. Currie expressly state in their declarations that they complained to their Team Leaders about work activities for which they were not being paid, but that their Team Leaders responded that these activities had to be deducted from their hours worked as a matter of "[Defendant's] corporate policy." (Anderson Decl. at ¶ 18; *see also* Currie Decl. at ¶¶ 19-21.)[7] Similarly, as to Defendant's

_____

[7]Indeed, Ms. Currie states that she raised this issue not only with her Team Leader but also with Ms. Jones, who told her that Defendant "maintained a policy of only paying

suggestion that each of the individual Team Leaders who supervised Plaintiff and the other potential class members might have deviated from Defendant's written policies in different ways, Plaintiff has produced evidence that she and Ms. Currie both were told by their Team Leaders that the complained-of reductions in their hours worked were a product of a corporate policy, and not the individual decisions of these supervisors. (*See* Anderson Decl. at ¶ 18; Currie Decl. at ¶¶ 19-21.) To the extent that the record on this point is contested and remains open to exploration upon the commencement of discovery, the Court already has explained that it "does not resolve factual disputes" in analyzing a pre-discovery request for conditional certification of an FLSA collective action. *Fisher,* 665 F. Supp.2d at 825 (internal quotation marks and citation omitted); *see also Wlotkowski v. Michigan Bell Telephone Co.,* 267 F.R.D. 213, 219 (E.D. Mich. 2010) (explaining that a defendant's evidence refuting a plaintiff's showing of similarly situated employees is more properly "addressed at the second stage" of the § 216(b) certification process).

Finally, Defendant argues that the modest record submitted by Plaintiff in support of her motion is inadequate to establish that Plaintiff and the other Representatives employed at Defendant's Farmington Hills call center were subject to a "common policy or plan that violated the law," *Fisher,* 665 F. Supp.2d at 825 (internal quotation marks and citations omitted), particularly where it is questionable whether Plaintiff and her fellow declarant, Ms. Currie, have personal knowledge about Defendant's corporate policies and practices governing employee compensation. The Court rejected this same challenge in *Fisher,* however, explaining that the declarants in that case had sufficiently "aver[red] that their

representatives for time spent engaged in telephone calls with customers." (Currie Decl. at ¶ 21.)

supervisors were aware of Defendant's alleged illegal practices." 665 F. Supp.2d at 826. Likewise, Plaintiff and Ms. Currie expressly state in their declarations that they learned of Defendant's allegedly unlawful corporate policies as a direct result of discussions with their supervisors, in which they were told that their work hours were reduced pursuant to Defendant's policy that Representatives should be paid only for time spent in telephone calls with customers. (*See* Anderson Decl. at ¶ 18; Currie Decl. at ¶¶ 19-21.)

Plaintiff and Ms. Currie further state that in their discussions with and observations of other Representatives at the Farmington Hills facility, they learned that some of these fellow employees (i) also had been instructed to arrive at work 15 minutes before the start of their scheduled shifts so that they could log into their computers and load the necessary computer applications before their shifts began, (ii) also had asked to be paid for these pre-shift activities but had received no response to these requests, and (iii) also had been advised of Defendant's corporate policy that Representatives were paid only for the time they spent on the telephone with customers. (*See* Anderson Decl. at ¶¶ 13, 16, 19; Currie Decl. at ¶¶ 13, 16.) To the extent that Defendant contends that these statements should be discounted as containing hearsay or as lacking a sufficient basis in the personal knowledge of the two declarants, this Court recognized in *Fisher* that a plaintiff's evidence in support of a pre-discovery motion for conditional certification need not "meet the same evidentiary standards applicable to motions for summary judgment[,] because to require more at this stage of the litigation would defeat the purpose of the two-stage analysis under Section 216(b)." 665 F. Supp.2d at 826 (internal quotation marks and citation omitted).

To be sure, the lead plaintiffs in *Fisher* submitted the "declarations of 67 opt-ins," and also "provided the deposition testimony of eight opt-ins supporting their claim that they are

all victims of a common policy or plan . . . that violates the FLSA.  667 F. Supp.2d at 826.

Here, in contrast, Plaintiff offers only her own declaration and that of one other opt-in

plaintiff, Ms. Currie, and she has identified only two other individuals who have given their

written consent to be joined as plaintiffs.  Nonetheless, as explained by another court in this

District, "the Sixth Circuit has never required evidence that others will opt in before the

[conditional] certification decision can be made," and there is no threshold number of co-

worker declarations that a plaintiff must provide in order to make the requisite modest

factual showing of similarly situated employees who are subject to a common policy or

plan.  *Shipes v. Amurcon Corp.,* No. 10-14943, 2012 WL 995362, at *8-*9 (E.D. Mich.

March 23, 2012); *see also Myers v. Marietta Memorial Hospital,* 201 F. Supp.3d 884, 892

(S.D. Ohio 2016).  While the record here is not overwhelming, the Court finds it sufficient

to meet the fairly lenient standard for demonstrating, in the pre-discovery phase of this

case, that Plaintiff and other similarly-situated Representatives employed at Defendant's

Farmington Hills call center were deprived of compensation mandated under the FLSA as

a result of common corporate policies and procedures adopted by Defendant.

### C. The Notice Proposed by Plaintiff Is Appropriate, But This Notice Should Be Sent Only by Ordinary and Electronic Mail and Not by Text Message.

Plaintiff's motion is accompanied by a proposed notice that she wishes to send to

each member of the proposed plaintiff class, and she requests authorization to distribute

this notice by ordinary mail, electronic mail, and text message.  In response, Defendant

contends that the proposed notice should be sent only by ordinary mail, and it also argues

(i) that it should be ordered to provide a more limited set of information in response to

Plaintiff's request that it identify the members of the proposed class, (ii) that Plaintiff's

notice should more specifically identify the start and end dates of the period during which prospective class members must have worked at Defendant's Farmington Hills call center, and (iii) that conditional certification should be limited to only those Representatives who worked on the Consumers Energy campaign. The Court already has addressed (and rejected) the last of these contentions in its discussion of Plaintiff's showing of similarly situated employees. As to Defendant's remaining arguments, the Court agrees that notice via text message is not appropriate and that the class period should be more specifically delineated, but otherwise approves the notice proposed by Plaintiff.

As Defendant correctly observes, it must supply the telephone numbers of its current and former employees in order to enable Plaintiff to serve her notice by text message, and this is an unnecessary intrusion upon the privacy of these individuals. In addition, the Court finds that the transmission of notice by text message could well be viewed by the recipients as harassing in nature, and that a significant number of recipients are likely to disregard this notice as "spam." Accordingly, the Court concludes that notice by text message is not appropriate. The Court does not agree, however, with Defendant's further contention that notice by electronic mail is unwarranted. As Plaintiff points out, such notice comports with a trend toward greater use of e-mail (and corresponding less use of ordinary mail) for most types of communications. It follows that Defendant should provide e-mail addresses for the potential members of the plaintiff class, but that it need not provide telephone numbers.

As for Defendant's contention that it should not have to provide dates of employment or job titles for potential class members because this information is already "encompassed in Plaintiff's class description," (Defendant's Response Br. at 14), the Court does not agree that this information is unnecessarily duplicative. Rather, the information requested by

20

Plaintiff provides greater detail about the employment histories of the potential class members, and this is likely to prove useful in subsequent stages of this litigation.

Finally, Defendant argues that the notice issued by Plaintiff should specifically identify the start and end dates of the time period in which class members must have been employed as Representatives at Defendant's Farmington Hills facility. As Plaintiff recognizes, the appropriate period encompassed by her proposed collective action is "three (3) years prior to the filing of the complaint." (Plaintiff's Reply Br. at 6.) The Court agrees with Defendant that the proposed notice provided by Plaintiff is not sufficiently specific in identifying this three-year period. In particular, where this notice refers to individuals employed at Defendant's Farmington Hills call center "at any time during the last three years," it should be amended to instead refer to individuals employed at this location "at any time during the three-year period beginning on November 7, 2013 and ending on November 7, 2016."

## III. CONCLUSION

For these reasons,

The Court hereby GRANTS Plaintiff's December 30, 2016 motion for conditional certification and court-ordered notice (Dkt. 11), except to the limited extent that the Court has instructed Plaintiff to amend her proposed notice and to issue this notice by ordinary and electronic mail only.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 9, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 9, 2017, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager